## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

HEPTAGON ASSET MANAGEMENT, C.V.
Zadelmakerstraat 98
Velserbroek,
Noor-Holland Netherlands 1991,

       and

HEPTAGON SOCIEDAD DE CORRETAJE
DE VALORES, C.A.,
Torre Provincial A, Piso 12
Avenida Francisco de Miranda,
Caracas, Venezuela,

       Plaintiffs,

       v.

CARACAS INTERNATIONAL BANKING
CORPORATION
221 Ave Ponce de León
221 Plaza, Suite 701
San Juan, Puerto Rico 00918,

       Defendant.

## COMPLAINT

TO THE HONORABLE COURT:

    Plaintiffs, Heptagon Asset Management, C.V. and Heptagon Sociedad de Corretaje de

Valores, C.A., respectfully allege:

## THE PARTIES

## PLAINTIFFS

1.      Plaintiff, Heptagon Asset Management, C.V. ("HAM"), is a Dutch Limited Partnership, duly organized and existing under the laws of the Netherlands, with its principal offices and place of business in Caracas, Venezuela.

2.      Plaintiff, Heptagon Sociedad de Corretaje de Valores, C.A. ("HSCV"), is a business entity, duly organized and existing under the laws of Venezuela, with its principal place of business in Caracas, Venezuela.

3.      Plaintiffs, HAM and HSCV (collectively "Heptagon") are interrelated entities in the business of providing financial services, with a focus in securities brokerage, market making, proprietary trading, tax advisory and mergers and acquisitions of private companies.

## DEFENDANT

4.      Caracas International Banking Corporation ("CIBC") is an international banking entity duly organized and existing pursuant to Act 52 of August 11, 1989, P.R. Laws Ann., tit. 7, § 232 et seq., as amended, also known as the "International Banking Center Regulatory Act." CIBC is duly licensed to do business in Puerto Rico by the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico, and is fully subject to the regulatory, supervisory and examination authority of said Office.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under Title 28 of the U.S. Code, Section 1332, in that this dispute is between plaintiffs that are citizens of the Netherlands and Venezuela, and a defendant that is a citizen of Puerto Rico, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      Venue is appropriate in this Court under Title 28 of the U.S. Code, Section 1391, because Defendant CIBC resides and is subject to personal jurisdiction in this judicial district,

2

and a substantial part of the events and omissions giving rise to this Complaint occurred in this judicial district.

## FACTS

7.      On November 20, 2008, Jorge Nogueroles, in his capacity as CIBC's Executive President ("Nogueroles"), contacted Heptagon to request a security swap transaction (known in the industry as a "permuta") of approximately $3,000,000.

8.      Nogueroles specifically stated that Heptagon's client would be CIBC.

9.      Heptagon expressly and reasonably relied upon the foregoing representations in agreeing to conduct the swap transaction with CIBC.

10.      Neither Nogueroles nor anyone else at CIBC informed Heptagon on November 20, 2008, that the funds to perform the swap transaction would be transferred directly from a third party account at CIBC instead of being paid with CIBC's own funds from its own account.

11.      Nor did Nogueroles or anyone else at CIBC inform Heptagon that CIBC would originate the funds to perform the swap transaction from the account of an individual arrested days earlier in a highly-publicized prosecution for drug trafficking, money laundering and conspiracy to commit the foregoing offenses.

12.      Heptagon would not have agreed to conduct the swap transaction if Nogueroles or anyone else at CIBC had disclosed to Heptagon the information contained in paragraphs 10 and 11, above.

13.      Based on the request by CIBC and the information that was disclosed by CIBC, Heptagon agreed to conduct a permuta transaction with CIBC in the amount of $3,173,000. Pursuant to CIBC's request, Heptagon conducted that transaction on November 20th.

14.     The transaction had three stages, all of which occurred on the same day.  First, CIBC purchased a U.S. dollar-denominated security from HAM worth $3,173,000.  As purported consideration for the purchase of this security, CIBC credited or deposited the sum of $3,173,000 into HAM's account at CIBC numbered XXXXX-1350.  Second, CIBC exchanged the U.S. dollar-denominated security it had just purchased for a Venezuelan bolívar-denominated security.  Third, CIBC sold the bolívar-denominated security in Venezuela to HSCV for 16,499,600 bolívares.  Pursuant to Nogueroles' explicit instruction, HSCV delivered a check for 16,499,600 bolívares on November 20, 2008, to Banco Nacional de Crédito ("BNC"), an affiliate of CIBC, where Nogueroles also served as Executive President.

15.     On January 16, 2009, the U.S. Government executed a seizure warrant at CIBC and seized $3,173,000 from HAM's bank account numbered XXXXX-1350 at CIBC ("First Seizure").

16.     The seizure warrant was based on the allegation that the funds that CIBC paid to HAM in the first stage of the swap transaction had actually been transferred directly to HAM's account from the account of another CIBC customer, Abdala Makled-Al Chaer ("CIBC Customer").  The seizure warrant further stated that the funds in CIBC Customer's account at CIBC were forfeitable proceeds of criminal activity.

17.     In fact, as Heptagon subsequently learned, CIBC's representations to Heptagon on November 20, 2008, were false, fraudulent, a breach of contract, and a violation of honest and standard banking practices.  Unbeknownst to Heptagon and without any permission or agreement from Heptagon, CIBC transferred $3,173,000 to HAM's account at CIBC directly from the account of CIBC Customer.

18.     On information and belief, Nogueroles and CIBC believed that the funds in CIBC Customer's account at CIBC were subject to seizure and potential forfeiture prior to proposing the permuta transaction with Heptagon on November 20, 2008.

19.     On information and belief, Nogueroles and CIBC were fully aware by November 20, 2008, that CIBC Customer had been arrested and charged just days earlier for drug trafficking, money laundering and conspiracy to commit said offenses.

20.     If CIBC had truthfully informed Heptagon that it was purchasing the U.S. security with funds from CIBC Customer's account at CIBC, Heptagon would have refused to conduct the transaction.

21.     On February 19, 2009, the United States Attorney for the District of Puerto Rico filed a Verified Complaint for Forfeiture in Rem in the United States District Court for the District of Puerto Rico, alleging that the $3,173,000 seized from HAM's bank account on January 16, 2009, was subject to forfeiture as a result of having been transferred directly from the CIBC bank account of CIBC Customer to the CIBC bank account of HAM.

22.     On March 17, 2009, the U.S. Government executed a second seizure warrant at CIBC and seized $7,142,685.18 from HAM's bank account at CIBC ("Second Seizure").

23.     Again, the seizure warrant relied upon the allegation that $3,173,000 of funds from CIBC Customer's account at CIBC had been transferred into HAM's account on November 20, 2008.  In fact, HAM's account at CIBC on March 17, 2009, held only $5,560,867.11, with the difference resulting in an unauthorized overdraft of the HAM account.

24.     On June 15, 2009, the United States Attorney for the District of Puerto Rico filed a Verified Complaint for Forfeiture in Rem in the United States District Court for the District of Puerto Rico, alleging that the $7,142,685.18 was subject to forfeiture.

25.     By letter to CIBC dated February 17, 2009, HAM demanded the immediate return of the $3,173,000 seized from HAM's account, together with all expenses incurred.  Despite its obligation to do so, CIBC has failed and refused to return the $3,173,000 to HAM.

26.     By letter to CIBC dated September 15, 2009, HAM renewed the demand for the immediate return of the $3,173,000 seized from HAM's account on January 16, 2009, and further demanded the immediate return of $5,560,867.11 seized from HAM's account on March 17, 2009, together with all expenses incurred.  Again, despite its obligation to do so, CIBC has failed and refused to return the $3,173,000 and the $5,560,867.11 to HAM, and has further failed to reimburse HAM's expenses or other damages resulting from those seizures.

27.     As a result of CIBC's unauthorized, unlawful and improper transfer of funds from the account of CIBC Customer at CIBC to the account of HAM at CIBC, HAM and HSCV have suffered substantial losses including seizures totaling $8,733,867.11, lost business opportunities, injury to reputation, legal fees and expenses and substantial additional damages.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**[Nullity Of Swap Transaction Due To Deceitful Inducement]**

28.     Heptagon re-alleges and incorporates by reference paragraphs 1 through 27 as if fully set forth herein.

29.     CIBC represented that it was the counterparty for the November 20, 2008, swap transaction and that it would pay for the U.S. dollar-denominated securities.  CIBC failed to disclose that it intended to transfer the $3,173,000 agreed as compensation for the U.S. dollar-denominated security from the CIBC account of a third party, CIBC Customer, who had been arrested and indicted only days earlier as a drug trafficker and money launderer.

6

30.    CIBC's representations were false, misleading and/or incomplete because the funds transferred to HAM's account were transferred directly from CIBC Customer's account at CIBC.  Heptagon did not know that CIBC's representations were false, misleading and/or incomplete.

31.    If Heptagon had known that the funds to be transferred would be from CIBC Customer's account, it would not have agreed to the swap transaction with CIBC.

32.    Heptagon relied on CIBC's November 20, 2008, representations and was induced thereby to consent and agree to conduct the security swap transaction on that day.

33.    As a result of relying on CIBC's false representations, HAM unknowingly received $3,173,000 from CIBC Customer's account and became the victim of seizures by the U.S. Government.

34.    The unauthorized transfer of these funds from CIBC Customer's account at CIBC into HAM's account at CIBC was the direct and proximate cause for the issuance and execution of the seizure warrants executed on HAM's account at CIBC on January 16, 2009, and on March 17, 2009.

35.    CIBC's false representation and deliberate failure to disclose the material fact that the funds to be paid to HAM for the November 20, 2008, swap transaction would be from CIBC Customer's account constitutes deceit that vitiates and renders Heptagon's consent to the security swap transaction null and void *ab initio*. Under the law of Puerto Rico, "[c]onsent given by error . . . or deceit shall be void."  P.R. Laws Ann., tit. 31, section 3404, and, "[t]here is deceit when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made."  P.R. Laws Ann., tit 31, section 3408.

36.     The inexistence and nullity of the swap transaction requires the parties to return their respective considerations ("prestaciones") or, if that is not possible, the value thereof. "When the nullity of an obligation has been declared, the contracting parties shall restore to each other the things which have been the object of the contract with their fruits, and the value with interest . . . ." P.R. Laws Ann., tit. 31, section 3514.

37.     HAM and HSCV are entitled to declaratory relief nullifying the swap transaction, ordering CIBC to return the U.S. securities, or their equivalent, plus consequential damages, including but not limited to all amounts seized from HAM on January 16 and March 17, 2009, loss of business opportunity, loss of reputation, interest computed from the respective seizure dates, costs and attorney's fees, and all other appropriate remedies under law.

## SECOND CLAIM
### [Breach of Contract]

38.     Heptagon re-alleges and incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

39.     CIBC induced HAM to agree to the swap transaction on November 20, 2008, pursuant to which it would purchase a U.S. dollar-denominated security for $3,173,000 and pay the aforesaid price from its own, lawful funds.

40.     HAM delivered the U.S. dollar-denominated security to CIBC in accord with the parties' agreement.

41.     CIBC breached its obligation in bad faith under the swap transaction by providing funds from an unidentified third party, CIBC Customer, that it had reason to know might be subject to seizure and potential forfeiture as the proceeds of unlawful activities.

42.     HAM seeks monetary damages, compensatory and consequential damages for the breach of contract, including but not limited to all amounts seized from it on January 16 and

March 17, 2009, loss of business opportunity, loss of reputation, interest computed from the respective seizure dates, costs and attorney's fees and all other appropriate remedies under law.

## THIRD CLAIM

### [Fault, Negligence and Willful Misconduct]

43.     Heptagon re-alleges and incorporates by reference paragraphs 1 through 42 as if fully set forth herein.

44.     As depositary of HAM's funds, CIBC owed a duty of care to abide by applicable laws and regulation, and to conform to a certain standard of conduct expected of a prudent banker with respect to protecting HAM's funds deposited therein.

45.     CIBC owed a duty to protect HAM's funds from any risk that could foreseeably lead to the seizure thereof by law enforcement authorities as a result of their comingling with funds potentially derived from drug trafficking and money laundering activities.

46.     It was reasonably foreseeable that the transfer of CIBC Customer's funds by CIBC into HAM's account at CIBC would jeopardize all funds in HAM's account by subjecting them to seizure by the U.S. Government.

47.     CIBC's use and direct transfer of funds from CIBC Customer's account to HAM's account at CIBC to pay for the U.S. dollar-denominated securities was improper, negligent and willful misconduct by CIBC for which it is at fault.

48.     Once CIBC knew that the U.S. Government had endeavored to seize CIBC Customer's funds, its failure to notify HAM thereof and of the unauthorized transfer of CIBC Customer's funds into HAM's account was further fault, negligence and willful misconduct by CIBC towards HAM.

49.     CIBC's fault, negligence, willful misconduct and breach of duties of care were the direct and proximate cause of HAM's initial loss of $3,173,000, and of the subsequent loss of

$5,560,867.11, resulting from the execution first and second seizures warrants by U.S. Government agents.

50.     HAM seeks monetary damages, compensatory and consequential damages for the breach of contract, including but not limited to all amounts seized from it on January 16 and March 17, 2009, loss of business opportunity, loss of reputation, interest computed from the respective seizure dates, costs and attorney's fees and all other appropriate remedies under law.

## FOURTH CLAIM

### [Misappropriation of Funds]

51.     Heptagon re-alleges and incorporates by reference paragraphs 1 through 50 as if fully set forth herein.

52.     On January 16, 2009, CIBC responded to the seizure warrant served upon it by the U.S. Government by providing the U.S. Government agents with a check (#00365) in the amount of $3,173,000 payable to the U.S. Marshalls Services.  This check was drawn on bank account #xxxxxxxxx4470 at Banco Bilbao Vizcaya Argentaria, S.A. ("BBVA") in the name of Caracas International Banking Corporation.  CIBC thus responded to the seizure warrant by providing to the U.S. Government its own funds.

53.     Without authorization from HAM, CIBC then withdrew $3,173,000 from HAM's account #XXXXX-1350 at CIBC.  This taking of property belonging to HAM from HAM's account without authorization was illegal and a misappropriation of HAM's property.

54.     On March 17, 2009, CIBC responded to the seizure warrant served upon it by the U.S. Government by providing the U.S. Government agents with a check (#00371) in the amount of $7,142,685.18 payable to the U.S. Marshalls Services.  This check was drawn on bank account #xxxxxxxxx4470 at BBVA in the name of Caracas International Banking Corporation. CIBC thus responded to the seizure warrant by providing to the U.S. government its own funds.

55.    Without authorization from HAM, CIBC then withdrew $7,142,685.13 from HAM's account #XXXXX-1350 at CIBC, leaving that account with a negative balance of $1,581,758.07.   This taking of property belonging to HAM from HAM's account without authorization was illegal and a conversion of HAM's property.

56.    HAM seeks monetary damages, compensatory and consequential damages for the misappropriation, including but not limited to all amounts seized from it on January 16 and March 17, 2009, loss of business opportunity, loss of reputation, interest computed from the respective seizure dates, costs and attorney's fees and all other appropriate remedies under law.

### FIFTH CLAIM

### [Unjust Enrichment]

57.    Heptagon re-alleges and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

58.    CIBC received a U.S. dollar-denominated security from HAM, and transferred $3,173,000 in funds which were subject to seizure and potential forfeiture into HAM's account as payment for that U.S. dollar-denominated security on November 20, 2008.

59.    On January 16, 2009, CIBC withdrew $3,173,000 from HAM's account without authorization from any HAM signatory, the effect of which was to unilaterally undo the act of payment for the November 20, 2008, swap transaction which had resulted in CIBC ultimately receiving a Venezuelan bolívar-denominated security valued at 16,499,6000 bolívares.   CIBC has refused written demands to return the withdrawn funds and has not returned the Venezuelan bolivar-denominated security to HAM.

60.    CIBC received the benefit of the swap transaction, but did not provide any actual compensation and was thereby unjustly enriched.

61.     On March 17, 2009, CIBC withdrew a further $7,142,685.18 from HAM's account without authorization of any HAM signatory.  While CIBC has since corrected the $1,581,818.07 overdraft of HAM's account, CIBC has refused written demands to return the $5,560,867.11 it withdrew.

62.     HAM seeks restitution of its funds seized as a result of CIBC's unauthorized transfer thereof, consequential damages, together with interest from the respective seizure dates, costs, and attorney's fees, for all funds withdrawn by CIBC between January 16, 2009 and the present without the authorization of a HAM signatory.

## PRAYER FOR RELIEF

WHEREFORE, Heptagon respectfully requests that this Court enter a final judgment:

A.      Ordering CIBC to return $3,173,000 withdrawn from the bank account of HAM (#XXXXX-1350) at CIBC on January 16, 2009;

B.      Ordering the immediate refund of all fees and expenses incurred by HAM as a result of the January 16, 2009, withdrawal, including the fees and expenses of a line of credit obtained from CIBC in the amount of $3,173,000;

C.      Awarding pre-judgment interest on the $3,173,000 withdrawn from HAM's bank account with CIBC, beginning from January 16, 2009;

D.      Ordering CIBC to return the $5,560,867.11, withdrawn from the bank account of HAM (#XXXXX-1350) at CIBC on March 17, 2009;

E.      Awarding pre-judgment interest on the $5,560,867.11 withdrawn from HAM's bank account with CIBC, beginning from March 17, 2009;

F.      Awarding all damages, including $8,733,867.11, plus damages for loss of business opportunity, loss of reputation, lost profits and other injuries;

G.      Awarding all costs and attorneys' fees incurred by Heptagon as a result to CIBC's conduct, including all expenses incurred in connection with the two civil forfeiture actions;

H.      Awarding post-judgment interest at the statutorily-applicable rate until any final judgment against CIBC is fully satisfied; and

I.      Granting such further relief as the Court may deem just and appropriate.

Respectfully submitted.

In San Juan, Puerto Rico, this 9th day of October 2009.

**MCCONNELL VALDES LLC**
Attorney for
Heptagon Asset Management, C.V.
PO Box 364225
San Juan, Puerto Rico 00936-4225
Telephone: (787) 250-2628
Fax: (787) 474-9231

s/Sonia Torres
USDC-PR No. 209310
st@mcvpr.com

s/Gustavo A. Gelpi
USDC-PR No. 111610
gag@mcvpr.com

and

**BAKER BOTTS L.L.P.**
Attorneys for
Heptagon Asset Management, C.V.
1299 Pennsylvania Ave., NW
Washington, DC  20004-2400
Telephone: (202) 639-7703
Fax: (202) 585-1058

Jay L. Alexander (*pro hac vice* pending)
Kyle A. Clark (*pro hac vice* pending)